# UNITED STATES DISTRICT COURT
# DISTRICT OF ARIZONA

| | |
|---|---|
| Elizabeth K. Grimes,<br><br>               Plaintiff,<br><br>v.<br><br>Michael J. Astrue, Commissioner of Social Security,<br><br>               Defendant. | No. CIV 09-00510-TUC-CKJ (JM)<br><br>**REPORT AND RECOMMENDATION** |

Plaintiff Elizabeth K. Grimes ("Plaintiff") brings this action pursuant to 42 U.S.C. § 405(g), seeking judicial review of the final decision of the Commissioner of Social Security. This Social Security Appeal has been referred to the United States Magistrate Judge pursuant to Local Rule – Civil 72.2(a)(10) of the Rules of Practice of this Court. Based on the parties' cross motions of summary judgement and the record submitted to the Court, the Magistrate Judge recommends that the District Court, after its independent review, deny Plaintiff's Motion for Summary Judgment (Doc. 16) and affirm the decision of the Commissioner.

**I.     Procedural Background**

On December 22, 2006, Plaintiff filed her application for disability insurance benefits under Title II of the Social Security Act, alleging a disability onset date of January 1, 2007. (Tr. 12).[1] Her application was denied initially and upon reconsideration. (Tr. 55-59, 76-78). Plaintiff then requested a hearing before an administrative law judge ("ALJ") which was held

---
[1] "Tr." refers to the official transcript of the administrative record.

on June 30, 2008. (Tr. 73, 23-54). In a decision dated February 20, 20096, the ALJ found that Plaintiff was not disabled. (Tr. 9-22). Plaintiff requested review of the ALJ's decision which was denied by the Appeals Council on August 6, 2009. (Tr. 1-4). Accordingly, the ALJ's decision became the final decision of the Commissioner of Social Security. (Tr. 2). On September 9, 2009, Plaintiff filed a complaint with this Court seeking judicial review of the ALJ's decision pursuant to 42 U.S.C. § 405(g). (Doc. 1).

## II.  Record on Appeal

### A.  Plaintiff's Testimony

At the time of the hearing, Plaintiff was 60 years old. (Tr. 27). She is a high school graduate and attended some college which primarily consisted of technical training. (Tr. 28). She lives alone and gets help with cleaning from her grand daughter about once a month. (Tr. 33). She has a driver's license and can go to the grocery store. (*Id.*). She watches television during the day. (Tr. 34).

She was not working at the time of the hearing and in her most recent job she worked part-time for two years as an associate in the men's department at Macy's until June 1, 2007. (Tr. 28-29). At the time she quit, she was "in a lot of pain," and her husband was sick and died on July 30, 2007. (Tr. 29). Prior to working at Macy's, she worked for 15 years writing software for Verizon in Fort Wayne, Indiana. (Tr. 29-30). Before Verizon, she had worked for a mortgage company and had done insurance work. (Tr. 30).

The medications she was taking at the time of the hearing included Norvasc for high blood pressure, Lyrica for pain, Chantix to help her stop smoking, and an anti-anxiety medication. (Tr. 30-31, 34-35). She described her pain as follows:

> – in my, all my muscles. It's mostly located on the right side of my body. I have arthritis in my spine, and I have arthritis in, you know, I'm getting that age, my hands [and] feet. But I have fibromyalgia so the pain is a shooting pain, and then it's just a nagging pain on some days, but I'm always in pain.

(Tr. 32). She can stand approximately 30 minutes before having to sit, and sit for 30 minutes before she needs to stand. (Tr. 32-33). She reports having trouble concentrating and loses

her train of thought. (Tr. 36). She is unable to lift her grandchildren. (*Id.*). She is often fatigued and once a week will sleep all day and night. (*Id.*).

## B. Vocation Expert's Testimony

The ALJ asked Ruth Van Vleet, a vocational expert ("VE"), to assume a hypothetical individual, of Plaintiff's age, education, and work experience with limitations as follows:

> [S]he can only lift about 20 pounds on an occasional basis and ten pounds on a frequent basis, but she should, she should be able require [sic] an ability to sit and stand at her option at a minimum of about an hour each just to change position. And this hypothetical person could only climb, she could only occasionally climb, stoop, kneel, crouch, and crawl, and she can avoid, she should avoid climbing ladders, ropes, and scaffolds. This hypothetical person uses a cane for, occasionally using a can for uneven surfaces. She's got problems with her shoulders so she should avoid working above shoulder heights. She should avoid working at unprotected heights and hazardous moving machinery. She should, even though she smokes, I will still give her the benefit of the doubt that she should avoid where there are working, there might be excessive amounts of dust, fumes, and gases. Also, she should avoid working where there are extreme vibrations, and she should avoid where there is extreme cold temperatures. Now, this hypothetical has various parts of, she has pain in various parts of her body, in both her joints and muscles, that are primarily in her back, her hands, her feet, her right hip, and she's got some, in her abdomen, she's got some irritable bowel syndrome problems. She also has restless leg syndrome. And for the first hypothetical, I want you to assume that the pain level, the pain level that this hypothetical person has would be of a slight nature and would have a slight effect on her ability to do basic work activities or that condition is or can be controlled by appropriate medication or treatment without any significant or adverse side effects. This hypothetical person also has some other problems. She's got very slight obesity. She's got fibromyalgia. She's got hypertension. She's got occasional dizziness and tremors, also some occasional numbness or tingling on her feet and hands, but I've already considered these factors in the other portions of this hypothetical or to the extent that if they are in excess thereof, then these hypotheticals' miscellaneous impairments would be of a slight nature and would have a slight effect on her ability to do basic work activities or that condition is or can be controlled by appropriate medication without significant adverse side effects. All right. This hypothetical person also has some psychiatric problems in the form of depression and anxiety. She's got some symptoms of decreased, memory loss, and decrease in concentration. She's got some substance abuse in the form of smoking which is, I will not consider that portion other than I've already taken into consideration of all these other factors in this hypothetical. All

> right. These psychiatric problems then would be of, first of all, would be of a slight nature and would have a slight effect on her ability to do basic work activities, or that condition is or can be controlled by appropriate medication with significant side effects. All right. Basically with all those problems, could that hypothetical person do any of the past work that was done by Ms. Grimes?

(Tr. 44-46). After confirming with the ALJ that the hypothetical person's limitations could be controlled with medication without significant adverse side-effects, the VE opined that such an individual could perform the Plaintiff's past relevant work as a translation design analyst. (Tr. 46).

The ALJ then asked the VE to assume that the hypothetical person also had moderate pain that could be controlled by appropriate medication without significant side-effects. (Tr. 47-48). With this additional limitation, the VE opined that if the pain could be controlled, "they could still do the past job of translation design analyst. (Tr. 48). If the pain was severe and uncontrolled with medication, the VE indicated that such a person would not be able to perform the translation design analyst job or any other work. (Tr. 48-49).

**C.    Medical Evidence**

The records indicate that Plaintiff began seeing Netley D'Souza, M.D., in 2006. In April 2006, Dr. D'Souza saw Plaintiff for bronchitis and "some [lower back pain] that radiates down R[ight] leg." He described Plaintiff as an "alert female who appears mildly uncomfortable," and referred her to physical therapy for low back pain. (Tr. 256).

On August 16, 2006, Plaintiff presented complaining of lower back and right hip pain. (Tr. 252). She had gone to physical therapy, but after no improvement, she reported that the therapists felt she should see a pain specialist. (*Id*.). She also reported that she has a history of fibromyalgia which bothered her periodically. (*Id*.). On examination, Dr. D'Souza noted that there was no acute inflammation, but the right hip showed limited range of motion and was causing "discomfort with extreme positioning." (Tr. 253). She had previously been denied an MRI, but the doctor felt her symptoms were progressing and resubmitted the request. (*Id*.).

1 | MRIs of Plaintiff's right hip and lumbar spine were performed on August 21, 2006. The impression of the right hip was negative with findings reported as normal bilateral hips and musculature. (Tr. 273). The impression of the lumbar spine was of "[m]inimal multilevel disc degeneration," and otherwise negative. (Tr. 274). These findings were consistent with a previous radiograph taken on April 25, 2006, which showed "[n]o significant radiographic abnormality of the lumbar spine." (Tr. 275).

A week later, on August 23, 2006, Plaintiff presented complaining that the left side of her face was swollen and numb. (Tr. 249). Dr. D'Souza's assessment was "[p]robable Bell's Palsy" based on her symptoms and suggested further testing if there was no improvement. (Tr. 250). He also noted that Plaintiff was to see an orthopedist regarding her right hip pain and reported that her MRI was read as being normal. (*Id.*). She was seen again two days later for the facial swelling, the symptoms of which were reported to have decreased. Dr. D'Souza advised her to go to the emergency room, but she declined as she did not want to have to wait there." He sent her for an MRI of her head. (Tr. 247). An EKG "showed an incomplete right bundle branch but otherwise negative." (*Id.*)

On August 25, 2006, Plaintiff had an MRI of her brain and inner auditory canals. The findings reflected the ventricles and cerebral sulci were within normal limits, no abnormal intracranial enhancement, and the orbits and osseous structures appeared normal. (Tr. 272). The impression was "[m]ild chronic ischemic white matter changes, without evidence of acute intracranial abnormality," and "no evidence of abnormal enhancement along the left facial nerve to suggest left Bell's palsy." (*Id.*).

Plaintiff next presented on August 30, 2006, for follow-up. The doctor reviewed the results of her MRI, which were negative, and stated that "[h]er MRI did not show any enlargement of the nerve, but it could still be possible, though she seems to be doing well symptomatically and on exam." (Tr. 244-45).

/ / /

/ / /

1    From September to December 2006, Plaintiff saw Randall Prust, M.D., who diagnosed
2 sacroiliac joint pain, lumbar degenerative disc disease, hypertension, and right hip pain and
3 administered a series of steroid injections. (Tr. 257-67, 279-92, 293-97).

4    On September 26, 2006, Plaintiff returned for follow-up of her back problems. Dr.
5 D'Souza reported that she had an injection done by Dr. Prust, but was not sure it helped. (Tr.
6 240). Plaintiff believed "a lot of her symptoms may be due to fibromyalgia." The doctor
7 indicated that he would discuss treatment plans per Dr. Prust, continue with the injections, and
8 refer her back to physical therapy. (Tr. 241). He noted that, "[s]he also raises questions about
9 disability as she has not improved a whole lot." (*Id*.).

10    On October 25, 2006, Plaintiff returned for follow-up on her back pain. She reported
11 that "the pain has progressively gotten worse since her corticosteroid injection performed by
12 Dr. Prust 5 wks ago." She reported that her lower back pain level was "5/10," but her hip pain
13 was better. (Tr. 238). The doctor assessed her lower back pain as chronic and prescribed
14 Naprosyn and Flexeril and injected 60 mg of Toradol for acute pain relief. (Tr. 239).

15    She was next seen on December 13, 2006 for back pain and an ear ache. She had three
16 injections from Dr. Prust, which seemed to help, but reported that the pain "starting to recur."
17 (Tr. 235). She reported thinking of going on disability and again expressed that her
18 symptoms may be due to fibromyalgia. (*Id*.). The doctor noted that they discussed disability
19 and stated that, "I think she would qualify as she has been trying diligently to try to go back
20 and maintain her regular work schedule." (Tr. 236). On February 13, 2007, she returned for
21 follow-up and the assessment was largely unchanged. (Tr. 232-33). She was put on Lyrica
22 to see if it would help with her pain. (Tr. 233).

23    In a Medical Source Statement prepared for the Arizona Department of Economic
24 Security on March 8, 2007, Dr. D'Souza noted a diagnosis of "lower back & hip pain/lumbar
25 disk disease." (Tr. 228). He reported lifting restrictions of less than 10 pounds frequently,
26 standing limitations of at least 2 hours but less then 6 hours in an 8 hour day, and no sitting
27 laminations. (Tr. 229). The doctor based his opinions on "history/exam/MRI findings." (Tr.

228-29).

On April 3, 2007, a bone densitometry test was normal and indicated the Plaintiff's risk of fracture was low. (Tr. 354-361).

On April 13, 2007, Plaintiff was seen for a routine check-up and for right hand and wrist pain. (Tr. 347). Dr. D'Souza described Plaintiff's history as including hypertension, chronic back pain, fibromyalgia, osteopenia, anxiety, and depression. He continued with the same management of her historical problems and attributed the wrist pain as most likely due to repetitive stress at work and cane use. He recommended a more stable cane and a wrist brace. (Tr. 348).

On May 1, 2007, Plaintiff reported to Dr. Prust that, since she last saw him, her pain was 75% better overall and that four month intervals seem to work for her. Dr. Prust diagnosed lumbar degenerative disc disease, lumbar bulging disc, sacroiliac joint pain, fibromyalgia, hypertension, and right hip pain. He administered an epidural steroid injection. (Tr. 365-66).

On May 15, 2007, John Fahlberg, M.D., a State agency physician, prepared a Physical Residual Functional Capacity Assessment based on his review of Plaintiff's medical records. He concluded that Plaintiff could perform light work that did not require more than occasional climbing, stooping, kneeling, couching and crawling. He also found that Plaintiff should avoid concentrated exposure to extreme cold, vibration and hazards. He indicated that his conclusions were significantly different from Dr. D'Souza's, explaining that Dr. D'Souza's opinions were "based on subjective pain without much objective by MRI or exam." (Tr. 326-32).

On June 6, 2007, Plaintiff presented to Dr. D'Souza complaining of not feeling well for a week and needing to talk about her husband and disability forms. (Tr. 343). The doctor noted that most of her problems were related to the stress and anxiety associated with the hospitalization of her husband. That same day, Dr. D'Souza completed a Fibromyalgia Questionnaire indicating Plaintiff experienced widespread skeletal pain with tender point pain

in the occiput, trapezius, supraspinatus, lateral epicondyle, gluteal, greater trochanter, and knees. (Tr. 165). Her symptoms were described as including multiple tender points, non-restorative sleep, chronic fatigue, morning stiffness, muscle weakness, subjective swelling, irritable bowel syndrome, frequent severe headaches, numbness and tingling, breathlessness, difficulty concentrating, and vestibular dysfunction. The doctor reported the fatigue as incapacitating. (Tr. 167). At the same time, Dr. D'Souza completed a Pain Questionnaire indicating Plaintiff's pain was severe– described as "extreme impairment of ability to function"– such that it constantly interfered with Plaintiff's ability to maintain attention and concentration. (Tr. 168). Dr. D'Souza reported that both of these conditions had existed at least since November 2003.

On September 6, 2007, Plaintiff saw Dr. Prust with complaints of low back pain. Dr. Prust found she was neurologically unchanged. He diagnosed lumbar degenerative disk disease, lumbar bulging disk, sacroiliac joint disease, fibromyalgia, hypertension, and right hip pain and administered an epidural steroid injection. (Tr. 415-16).

On October 16, 2007, Plaintiff saw Dr. D'Souza about left knee pain and requesting lab work. (Tr. 404). She could not associate her knee pain with any injury or trauma. She was also dealing with the death of her husband and had just returned from Indiana where his services were held. She had left knee tenderness, very minimal swelling and tenderness with pressure in that area, and positive crepitus. Dr. D'Souza diagnosed left knee pain and bereavement and recommended a knee x-ray. He also prescribed medication. (Tr. 404-05).

On October 30, 2007, Anita Stafford, M.D., a State agency physician, reviewed the medical evidence and concluded that "[t]here is no clear evidence that [Plaintiff] has fibromyalgia. The [treating source] completed a [medical source statement] indicating this diagnosis but this form is not supported by his clinical notes." (Tr. 369). On October 31, 2007, Eugene Campbell completed a Psychiatric Review Technique for the State and found Plaintiff's impairments "not severe," finding her depressive disorder secondary to her general medical condition. (Tr. 373).

1    On November 14, 2007, Plaintiff visited Dr. D'Souza to follow-up on her labs and for
2 grief counseling. (Tr. 401). She was having problems dealing with issues related to the loss
3 of her husband, including crying without specific reason. She also reported having been
4 turned down for disability benefits and having financial difficulty. (*Id*.) The doctor advised
5 her to attend a bereavement and support group. The doctor also advised her to volunteer at
6 a local hospital, "so that she can find something to keep her busy." (Tr. 402). Her knee pain
7 was reported as improving. Her x-rays were negative and normal and she did not want any
8 treatment of follow-up. (Tr. 403).

9    On February 4, 2008, Plaintiff presented to Dr. D'Souza complaining of dizzy spells.
10 He treated her dizziness with medication and noted that "she feels her symptoms are better."
11 The doctor also noted hat she was doing better in relation to her bereavement from the loss
12 of her husband. (Tr. 398-400). She returned two days later reporting that she had one dizzy
13 spell the day before, but was feeling better. (Tr. 395). She also reported that she planned to
14 do some volunteer work with the national forest in Oregon beginning in June. (*Id*.). She
15 followed-up on February 13, reporting her dizziness had improved. (Tr. 392). She did not
16 want any testing, but the doctor recommended testing if her dizziness persisted. (Tr. 393).

17    In a series of questionnaires dated February 25, 2008, Dr. D'Souza addressed
18 Plaintiff's spinal disorders, fibromyalgia, and exertional limitations. He reported her back
19 impairment involved her thoracic and lumbar spine without compression of a nerve root with
20 persistent muscle spasm, limitation of motion, muscle weakness and reflex loss. (Tr. 406).
21 He reported that she had diminished circulation, dizziness, tremors, weakness/pain, slow gait,
22 and diminished sensation and reflexes. He reported she had no atrophy or signs of
23 radiculopathy and had minimal loss of muscle strength. (Tr. 407-08). He noted that her MRI
24 findings did not support surgical intervention. (Tr. 408). Dr. D'Souza anticipated that her
25 condition would cause her to be absent from work more than two days a month. (Tr. 409).
26 In the fibromyalgia questionnaire Dr. D'Souza stated that plaintiff experienced widespread
27 pain and axial skeletal pain. He said she had tenderness at the following sites: occiput, low

cervical, trapezius, supraspinatous, lateral epicondyle, gluteal, greater trochanter, and knee. He said that Plaintiff's pain and fatigue were incapacitating to the point she could not perform activities involving attention, concentration, memory, or reliability at least 50 percent of a workday. He said her symptoms were consistent with clinical findings and she had experienced changes in mood and thought. (Tr. 410-12). He stated that she required complete freedom to rest frequently without restriction. (Tr. 413). He stated that Plaintiff was incapable of sedentary work on a sustained and full-time basis. (Tr. 414).

On February 27, 2008, Dr. D'Souza referred Plaintiff to Mitchell Halter, M.D., Ph.D., for pain management. Dr. Halter prescribed medication. (Tr. 420-21). On March 24, 2008, she returned to Dr. D'Souza to evaluate the side effects of the medications prescribed by Dr. Halter. He diagnosed bronchitis/history of tobacco use and prescribed medication. (Tr. 390). On April 21, 2008, Dr. Halter administered an epidural steroid injection. (Tr. 417-18).

On May 9, 2008, Plaintiff saw Dr. D'Souza for epigastric discomfort. The doctor indicated that if the symptoms persisted, he would do an ultrasound and consider doing a CT scan. (Tr. 426).

### D. ALJ's Findings and Decision

On February 20, 2009, the ALJ made the following findings:

> 1. The claimant meets the insured status requirements of the Social Security Act through March 31, 2011.
>
> 2. The claimant has not engaged in substantial gainful activity since January 1, 2007, the alleged onset date (20 CFR 404.1571 *et seq.*).
>
> 3. The claimant has the following severe impairments: degenerative disc disease, chronic low back pain, slight obesity, left knee pain, fibromyalgia, hypertension, occasional dizziness and tremors, irritable bowel syndrome, chronic illnesses including tobacco use, and nicotine abuse, depression, and anxiety (20 CFR 404.1521 *et seq.*).
>
> 4. The claimant does not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1525 and 404.1526).

- 10 -

> 5. After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b), except with a sit/stand option at a minimum of one hour each, and is further limited to occasional climbing, stooping, kneeling, crouching, and crawling, but never climb ladders, ropes, and scaffolds. The claimant requires the occasional use of a cane for uneven surfaces. The claimant is precluded from working above shoulder [height], and should avoid working at unprotected heights and around hazardous moving machinery, and working around excessive amount of dust, fumes, and gases, and avoid working with extreme vibrations and extreme cold temperatures. Te claimant's moderate pain level and psychiatric problems are controllable with appropriate medications and treatment without any significant adverse side effects.
>
> 6. The claimant is capable of performing past relevant work as a translation design analyst. This work does not require the performance of work-related activities precluded by the claimant's residual functional capacity (20 CFR 404.1565).
>
> 7. The claimant has not been under a "disability" as defined in the Social Security Act from March 20, 2005 through the date of this decision (20 CFR 404.1520(g) and 416.920(g)).

(Tr. 14-22).

## III. Standard of Review

A court reviews the Commissioner's final decision to determine whether the factual findings are supported by substantial evidence and whether the proper legal standards were applied in weighing the evidence and making the decision. *Flake v. Gardner*, 399 F.2d 532, 540 (9th Cir. 1968). "Substantial evidence" means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion. *Burch v. Barnhart*, 400 F.3d 676, 679 (9th Cir. 2005). Where evidence is susceptible to more than one rational interpretation, a court must uphold the ALJ's conclusion. *Id.*

The standard of review in social security appeals is the same whether the case involves a denial of disability insurance benefits or a denial of supplemental security income. 42 U.S.C. §§ 405(g) and 1383 (c)(3). The definition of disability is also the same: whether the claimant became unable to engage in substantial gainful activity by reason of any medically determinable physical or mental impairment that can expect to result in death or which has

lasted or can be expected to last for a continuous period of at least twelve months. 20 C. F.R. §§ 404.1505 and 416.905.

**IV.	Discussion**

   **A.	Evaluation Process**

The Social Security Regulations establish a five-step sequential evaluation process to be followed by the ALJ in a disability case. 20 C.F.R. § 404.1520. At **step one** of the process, the ALJ must determine whether the claimant is currently engaged in substantial gainful activity; if so, a finding of non-disability is made and the claim is denied. 20 C.F.R. § 404.1520(b).

When the claimant is not currently engaged in substantial gainful activity, the ALJ, in **step two**, must determine whether the claimant has a severe impairment or combination of impairments significantly limiting her from performing basic work activities; if not, a finding of non-disability is made and the claim is denied. 20 C.F.R. § 404.1520(c). A severe impairment or combination of impairments exists when there is more than a minimal effect on an individual's ability to do basic work activities. 20 C.F.R. § 404.1521(a); *Smolen v. Chater*, 80 F.3d 1273, 1290 (9th Cir. 1996). Basic work activities are "the abilities and aptitudes necessary to do most jobs," including physical functions such as walking, standing, sitting, lifting, pushing, pulling, reaching, carrying or handling, as well as the capacity for seeing, hearing and speaking, understanding, remembering and carrying out simple instructions, use of judgment, responding appropriately to supervision, co-workers and usual work situations, and dealing with changes in a routine work setting. 20 C.F.R. § 404.1521(b).

At the **third step**, the ALJ must compare the claimant's impairment to those in the Listing of Impairments, 20 C.F.R. § 404, Subpart P, App. 1; if the impairment meets or equals an impairment in the Listing, disability is conclusively presumed and benefits awarded. 20 C.F.R. § 404.1520(d).

When the claimant's impairment does not meet or equal an impairment in the Listing, in the **fourth step**, the ALJ must determine whether the claimant has sufficient RFC despite

the impairment or various limitations to perform her past work; if so, a finding of non-disability is made and the claim is denied. 20 C.F.R. § 404.1520(e).

When the claimant shows an inability to perform past relevant work, a prima facie case of disability is established and, in **step five**, "the burden shifts to the Commissioner to show that the claimant can perform some other work that exists in 'significant numbers' in the national economy, taking into consideration the claimant's residual functional capacity, age, education, and work experience." 20 C.F.R. § 404.1520(f).

**B.     Analysis**

Here, the ALJ resolved Plaintiff's claim at step four and found that Plaintiff "is capable of performing past relevant work as a translation design analyst." (Tr. 21).

Plaintiff raises two objections to the ALJ's findings and disability determination: 1) that the ALJ erred by rejecting the opinion of her treating physician without providing adequate reasons; and 2) that the ALJ erred by rejecting Plaintiff's testimony without providing adequate reasons. Both arguments are evaluated below.

### 1.    Dr. D'Souza's opinion is not well-supported and is contradicted by other evidence in the record.

The Plaintiff takes issue with the ALJ's determination that Dr. D'Souza's opinion that she is disabled "conflicts with other substantial evidence of record," and that Dr. D'Souza failed to "consider the entire record, including the statements of collateral sources and the objective findings of other treating physicians." (Tr. 20-21). The Commissioner argues the Plaintiff's arguments are without merit and the ALJ's decision is supported by substantial evidence.

If a treating or examining doctor's opinion is contradicted by another doctor's opinion, an ALJ may only reject it by providing specific and legitimate reasons that are supported by substantial evidence. *Lester v. Chater*, 81 F.3d 821, 830-31 (9th Cir. 1995). The Ninth Circuit's standards for evaluating opinions from treating physicians are as follows:

> By rule, the Social Security Administration favors the opinion of
> a treating physician over non-treating physicians. *See* 20 C.F.R.

- 13 -

> § 404.1527. If a treating physician's opinion is "well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the] case record, [it will be given] controlling weight." *Id*. § 404.1527(d)(2). If a treating physician's opinion is not given "controlling weight" because it is not "well-supported" or because it is inconsistent with the other substantial evidence in the record, the Administration considers specified factors in determining the weight it will be given. Those factors include the "[l]ength of the treatment relationship and the frequency of examination" by the treating physician; and the "nature and extent of the treatment relationship" between the patient and the treating physician. *Id*. § 404.1527(d)(2)(i)-(ii). Generally, the opinions of examining physicians are afforded more weight than those of non-examining physicians, and the opinions of examining non-treating physicians are afforded less weight than those of treating physicians. *Id*. § 404.1527(d)(1)-(2). Additional factors relevant to evaluating any medical opinion, not limited to the opinion of the treating physician, include the amount of relevant evidence that supports the opinion and the quality of the explanation provided; the consistency of the medical opinion with the record as a whole; the specialty of the physician providing the opinion; and "[o]ther factors" such as the degree of understanding a physician has of the Administration's "disability programs" and their evidentiary requirements' and the degree of his or her familiarity with other information in the record. *Id*. § 404.1527(d)(3)-(6).

*Orn v. Astrue*, 495 F.3d 625, 631 (9th Cir. 2007).

In her motion, Plaintiff focuses on her physical limitations and contends that Dr. D'Souza's findings of muscle spasm, limitation of motion, muscle weakness, reflex loss, positive straight leg raising, inability to heal and to walk, lower extremity pain and sensory radiculopathy, chronic dizziness, tremor and decreased sensory response are supported by the opinions and treatment rendered by Dr. Halter and Dr. Prust. *Motion*, p. 8. Plaintiff contends that the ALJ's reasons for rejecting the opinions are vague and inaccurate, and therefore not subject to adequate review. While Plaintiff may find some support for this argument when considering the treatment rendered by the pain physicians to whom she was referred, her argument does not withstand scrutiny when evaluated based on other considerations cited by the ALJ in his decision.

The ALJ noted that "[p]hysical examinations were generally unremarkable with few minimal abnormal findings." (Tr. 19). The ALJ supported this statement by citing the records

- 14 -

of Dr. D'Souza which "reported from April 21, 2006 through May 19, 2008 that the claimant had continuing complaints of low back pain, however, practically all examinations of the back (approximately 15) were unremarkable with findings of no external bruising, no erythema, no tenderness to palpation, and usually normal range of motion and negative straight leg raise testing." (Tr. 19). A review of the record establishes this finding is legitimate. Although Dr. D'Souza characterized Plaintiff's maladies as completely disabling when completing disability forms, his records suggest otherwise. As the Commissioner points out, in February 2007, Dr. D'Souza found the Plaintiff had no acute joint inflammation, erythema, or warmth and had only "mild subjective" right hip discomfort. (Tr. 232-34). In April 2007, she was again reported to have no acute inflammation, erythema, or warmth in her joints. She had normal range of motion in her back with no tenderness to palpation and could lie down and rise from that position. (Tr. 346-48). In June, she had only "mild discomfort" on palpation of the muscles around the neck and again was reported with no acute inflammation, erythema, or warmth in her joints and only "mild" subjective discomfort in her right hip, and "some" discomfort to muscle palpation. (Tr. 343-45). Additionally, although not specifically cited by the ALJ, Plaintiff's 2006 MRI showed only minimal multilevel disc degeneration with no herniated disks or stenosis. (Tr. 274).

      The ALJ also addressed Plaintiff's knee complaints, noting that when Plaintiff complained of knee pain, Dr. D'Souza found she had "very minimal" knee swelling and tenderness. (Tr. 404-05). A subsequent x-ray of the knee was "negative and normal." (Tr. 402). In fact, virtually every objective diagnostic procedure failed to support the existence or extent of the condition for which it was ordered. Her brain MRI did not support a finding of Bell's palsy. (Tr. 272). An MRI of her hips was normal with "no DJD, malalignment, fracture, bone bruise, bone marrow edema, joint effusion, or bursal enlargement." (Tr. 273). An MRI of her lumbar spine showed only "mild, multilevel anterolateral disc bulge throughout the lumbar spine but no significant posterior or neural foraminal disc bulge," no significant muscle atrophy, no compression deformity, no significant disc height loss, no

central canal stenosis or neural foraminal stenosis and no significant facet degeneration, and the impression was "[m]inimal multilevel disc degeneration. No HNP, central canal stenosis, or neural foraminal stenosis." (Tr. 274). An x-ray of the lumbar spine showed "[n]o significant radiographic abnormality of the lumbar spine." (Tr. 275). Her EKG "showed an incomplete right bundle branch but otherwise negative." (Tr. 247).

Considering the evidence of the record, Dr. D'Souza's disability opinion is not "well-supported by medically acceptable clinical and laboratory diagnostic techniques" and is inconsistent with other substantial evidence in the record. SSR96-2p at *1, 61 Fed.Reg. 34,490, 34, 491, 1996 WL 374188 (July 2, 1996). As discussed above, and as determined by the ALJ, Dr. D'Souza's opinions "did not adequately consider the entire record." (Tr. 20). The ALJ's decision not to afford any significant weight to those opinions was supported by the objective evidence. As the ALJ concluded:

> In sum, the lack of objective medical evidence, the conservative nature of the treatment provided and multiple examinations performed, which revealed generally normal findings with subjective complaints of pain, showed little evidence of impairment, much less a disabling impairment.

(Tr. 21). As Dr. D'Souza's opinion was contradicted by those of Dr. Fahlberg and Dr. Stafford, the ALJ was permitted to find that the opinions of the non-examining doctors constituted substantial evidence because they were consistent with and supported by other independent evidence in the record. *Lester*, 81 F.3d at 830-31. Because the evidence is readily susceptible to the interpretation of the ALJ, the decision must be upheld. *Morgan v. Comm'r*, 169 F.3d 595, 599 (9th Cir. 1999).

**2. The ALJ's credibility determination must be upheld.**

Plaintiff argues that the ALJ, rather than first determining the credibility of Plaintiff's subjective complaints of pain, instead first determined her Residual Functional Capacity and "then compared the Plaintiff's symptoms to it to determine whether or not the Plaintiff's symptoms are credible." *Motion*, p. 10. However, Plaintiff's argument ignores the bulk of the ALJ's analysis of Plaintiff's credibility and the determination must be upheld.

1  "Questions of credibility and resolution of conflicts in the testimony are functions
2  solely of the Secretary." *Sample v. Schweiker*, 694 F.2d 639, 642 (9th Cir. 1982). The ALJ's
3  credibility findings must be supported by specific, cogent reasons. *See Rashad v. Sullivan*,
4  903 F.2d 1229, 1231 (9th Cir. 1990). When the credibility of pain testimony is at issue, and
5  there is medical evidence of an underlying impairment, the ALJ may not discredit a claimant's
6  testimony as to the severity of symptoms merely because they are unsupported by objective
7  medical evidence. *See Bunnell v. Sullivan*, 947 F.2d 341, 347-48 (9th Cir. 1991). Rather, the
8  ALJ must identify what testimony is not credible and what evidence undermines the
9  claimant's complaints. *Lester v. Chater*, 81 F.3d 821, 834 (9th Cir. 1995). The ALJ's findings
10 must be supported by clear and convincing reasons why a claimant's testimony of excess pain
11 is not credible and must be supported by substantial evidence in the record as a whole.
12 *Johnson v. Shalala,* 60 F3d. 1428, 1433 (9th Cir. 1995).

   In reviewing the medical evidence as a whole, the ALJ determined that her treatment was conservative and that the clinical and laboratory findings did not support the severity of pain reported by the Plaintiff. (Tr. 19). As discussed at length above, this finding is supported by the evidence in the record. Additionally, the ALJ found that Plaintiff "describes an active lift that includes handling her personal needs, maintaining her household while living alone, attending multiple medical appointments, and doing recent volunteer work." (Tr. 19). Plaintiff disputes none of these findings, nor could she. In fact, Dr. D'Souza, despite opining that she was incapacitated and "required complete freedom to rest frequently without restriction" (Tr. 410-13), only a few months before was advising her to volunteer at a local hospital, "so that she can find something to keep her busy." (Tr. 402). The fact that Plaintiff was able to perform limited activities of daily living such as driving, shopping and personal grooming, and that her treating physician was telling her to find volunteer work, provided legitimate support to the ALJ's credibility finding. *Bunnell*, 947 F.2d at 346.

   This Court finds that the ALJ's findings are both supported by substantial evidence and free of legal error.

## V. RECOMMENDATION FOR DISPOSITION BY THE DISTRICT JUDGE

Based on the foregoing and pursuant to 28 U.S.C. § 636(b) and Local Rule 1.17(d)(2), Rules of Practice of the United States District Court, District of Arizona, the Magistrate Judge recommends that the District Court, after an independent review of the record, **DENY** Plaintiff's Motion for Summary Judgment (Doc. 16) and uphold the final decision of the Commissioner.

This Recommendation is not an order that is immediately appealable to the Ninth Circuit Court of Appeals. Any notice of appeal pursuant to Rule 4(a)(1), Federal Rules of Appellate Procedure, should not be filed until entry of the District Court's judgment.

However, the parties shall have fourteen (14) days from the date of service of a copy of this recommendation within which to file specific written objections with the District Court. *See* 28 U.S.C. § 636(b)(1) and Rules 72(b), 6(a) and 6(e) of the Federal Rules of Civil Procedure. Thereafter, the parties have fourteen (14) days within which to file a response to the objections. If any objections are filed, this action should be designated case number: **CV 09-510-TUC-CKJ**. Failure to timely file objections to any factual or legal determination of the Magistrate Judge may be considered a waiver of a party's right to *de novo* consideration of the issues. *See United States v. Reyna-Tapia* 328 F.3d 1114, 1121 (9th Cir. 2003) (*en banc*).

DATED this 2nd day of August, 2010.

*Jacqueline Marshall*
Jacqueline Marshall
United States Magistrate Judge

- 18 -